Schenck *v.* Pittsburgh et al.

Argued January 5, 1950. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused January 30, 1950.

*Robert Van der Voort,* for plaintiff.

*Anne X. Alpern,* City Solicitor, for City of Pittsburgh and individual defendants.

*Theodore L. Hazlett, Jr.,* for Urban Redevelopment Authority of Pittsburgh.

*Charles E. Kenworthey,* with him *Ralph H. Demmler, Robert J. Dodds,* and *Reed, Smith, Shaw & McClay,* for Equitable Life Assurance Society of the United States.

*Harry F. Stambaugh,* Special Deputy Attorney General, with him *T. McKeen Chidsey,* Attorney General, for Commonwealth.

*Howard E. Stern,* with him *Milton C. Sharp,* for Redevelopment Authority of the City of Philadelphia.

*Irving W. Backman,* for intervenors.

OPINION BY MR. JUSTICE HORACE STERN, January 11, 1950:

Because of the great importance to the City of Pittsburgh of the redevelopment project which is here under attack, and because of circumstances that require a prompt adjudication of the issue now raised as to its legality, we took original jurisdiction of these proceedings.

Plaintiff is the part owner of a property at 420-422 Penn Avenue, Pittsburgh; the intervening plaintiffs own, respectively, properties at 416-418 Penn Avenue, 427 Liberty Avenue, and 429 Liberty Avenue. Plaintiff filed the present bill in equity for an injunction against the carrying out, under the Urban Redevelopment Law of May 24, 1945, P. L. 991, of a project for the redevelopment of a tract of land on which these properties are situated,—a tract which, constituting the original site of the City of Pittsburgh, is now covered almost exclusively by buildings devoted to commercial and industrial uses. The City Planning Commission certified approximately 59 acres which lie immediately to the east of the Point in Pittsburgh's "Golden Triangle" as a "blighted" area, and prepared a plan for its redevelopment. The Commonwealth of Pennsylvania had already acquired the westernmost 36 acres of this tract for the purpose of creating there a public park. The Urban Redevelopment Authority of Pittsburgh drafted a proposal for the redevelopment of the remaining 23 acres extending from Duquesne Way to Water Street and bounded on the east by Stanwix Street and Ferry Street; included therein was a proposed redevelopment contract with the Equitable Life Assurance Society of the United States as Redeveloper. The Authority's proposal, after being reviewed and approved by the City Planning Commission, was submitted to the City Council, which held a hearing thereon as prescribed by the Urban Redevelopment Law.

Meanwhile plaintiff filed his bill to enjoin the City Council from approving the proposal and the contract, to enjoin the City from appropriating any money to carry out the proposal, to enjoin the Authority and the Redeveloper from executing the contract, and to enjoin the Authority from taking any steps to acquire land within the project area by the exercise of the power of eminent domain or to convey any such land to the Redeveloper.

The proposed contract provides that the Authority shall promptly acquire title to all the property (with a few exceptions) situated in the area; that the Redeveloper shall pay to the Authority all sums necessary for the acquisition of the title to such property, advancing to it from time to time and at its request the sums currently needed by the Authority for that purpose; that, after acquiring title to each of the parcels laid out on the plan, the Authority shall convey the same or any part thereof to the Redeveloper; that, upon the Redeveloper's acquiring such title, it shall clear the parcel of all existing structures thereon (other than the named exceptions), shall erect three modern office buildings not less than 18 stories in height, do appropriate landscaping, make provision for parking spaces, construct garage facilities, rehabilitate the buildings which are to remain standing, and plant certain designated portions of the area in grass; that the Authority shall secure the vacation of all streets in the project area, the relocation of a certain portion of Liberty Avenue, and the removal and reconstruction of sewer and water mains; that the redevelopment shall be completed within four years from the time of the acquisition of title by the Redeveloper; that the Redeveloper shall not have the power, without the consent of the Authority, to sell or lease any of the property until the Authority shall have certified that the redevelopment project has been completed; that any

party acquiring or succeeding to the title and interest of the Redeveloper in any of the area shall be bound by the terms and covenants of the contract; that the Redeveloper shall not use or lease any of the property for other than the uses and buildings permitted by the plan during a period of 25 years from the date of the contract without the prior consent of the Authority; and that the Redeveloper shall secure housing for families residing in the project area who are displaced by the redevelopment operations. The contract is made terminable by the Redeveloper if a prescribed agreement with respect to sewers and streets is not made between the Authority and the City within 30 days after the execution of the redevelopment contract, or if the Authority shall have failed by June 1, 1950 to acquire title to all the property within the portion of the area on which the three office buildings are to be erected; in the event of such termination, however, the Redeveloper is to purchase all the property acquired by the Authority, paying to the latter the costs and expenses incurred in such acquisition. There are many other provisions contained in the contract, which, however, are not important in connection with the present discussion.

Plaintiff asserts that the mere fact that the City Planning Commission has certified the tract as a blighted area does not conclusively establish that the redevelopment of this particular land is in fact for a public purpose. The answer to this contention is that, in the absence of any indication that the Commission did not act in good faith or was wholly arbitrary in certifying the area designated by it as blighted, its certification to that effect is not subject to judicial review. Among the conditions enumerated in the Urban Redevelopment Law as constituting a "blighted" area are "inadequate planning of the area", "excessive land coverage by the build-

ings thereon", "defective design and arrangement of the buildings thereon", "faulty street or lot layout", and "economically or socially undesirable land uses." Such conditions were found by the City Planning Commission to exist; it pointed out that the area certified by it had been laid out on a street pattern which dated from the year 1784 and which was wholly unsuited to the needs of a modern city because of poorly located street space and failure to provide for the ever increasing traffic; that the area was marred by too great a building density; and that the commercial and industrial uses of the buildings thereon were in large part economically undesirable, as shown by a continuous reduction in the appraised values of the properties for tax purposes. The existence of these conditions brings the situation clearly within the scope of the Urban Redevelopment Law, and, since that act gives the power of eminent domain to the Urban Redevelopment Authority, it is for that agency, and not for the courts, to determine whether or not the power should be exercised in this particular instance. It has been held in many cases that where the right of eminent domain is vested in a municipality, an administrative body, or even a private corporation, the question as to whether the circumstances justify the exercise of the power in a given instance is not a judicial one, at least in the absence of fraud or palpable bad faith.*

Plaintiff contends that the commercial redevelopment of an existing commercial district, as in the present case, is not such a public purpose as the Urban Redevelopment

---

* *City of Philadelphia v. Ward*, 174 Pa. 45, 34 A. 458; *Price v. Pennsylvania R. R. Co.*, 209 Pa. 81, 58 A. 137; *Wilson v. Pittsburg & Lake Erie R. R. Co.*, 222 Pa. 541, 72 A. 235; *Scranton Gas & Water Co. v. Delaware, Lackawanna & Western R. R. Co.*, 225 Pa. 152, 73 A. 1097; *Sipe v. Tarentum Borough*, 263 Pa. 338, 106 A. 637; *Jury v. Wiest*, 326 Pa. 554, 193 A. 5; *King v. Union R. R. Co.*, 350 Pa. 623, 39 A. 2d 831.

Law envisages. He insists that redevelopment under the act must be limited primarily to the relieving of undesirable living conditions, and that any land which is not residential may be redeveloped only so far as the operation is ancillary and incidental to the redevelopment of a residential area; for support of this position he points to a clause in the title of the act which states as a purpose: to "supply sanitary housing in areas throughout the Commonwealth"; accordingly he argues that the erection of residential structures on the redevelopment area is a necessary concomitant of any project under the Urban Redevelopment Law. In *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 338, 54 A. 2d 277, 281, it was said that "The Urban Redevelopment Law closely parallels the provisions of the Housing Authorities Law of May 28, 1937, P. L. 955, . . . The fundamental purpose of both these acts was the same, namely, the clearance of slum areas, although the Housing Authorities Law aimed more particularly at the elimination of undesirable dwelling houses *whereas the Urban Redevelopment Law is not so restricted.*" If the Urban Redevelopment Law were to be held to apply only to the clearing of blighted *residential* areas and the reconstruction of dwelling houses thereon there would have been no reason for its enactment since it would have added nothing to the Housing Authorities Law already in force. On the contrary, the Urban Redevelopment Law was obviously intended to give wide scope to municipalities in redesigning and rebuilding such areas within their limits as, by reason of the passage of years and the enormous changes in traffic conditions and types of building construction, no longer meet the economic and social needs of modern city life and progress. Such needs exist, even if from a different angle, as well in the case of industrial and commercial as of residential areas. It is to be noted that the Urban Re-

development Law defines the term "redevelopment", as used in the act, as "The acquisition, replanning, clearance, rehabilitation or rebuilding of an area for residential, recreational, *commercial, industrial* or other purposes, including the provision of streets, parks, recreational areas and other open spaces."

Plaintiff urges that the proposed contract between the Authority and the Redeveloper is faulty in that its provisions do not absolutely insure the carrying out of the project, and he conjures up possible situations and contingencies of which the Redeveloper might take advantage and thereby relieve itself of the performance of its obligations. It is for the Authority and the Redeveloper, however, to decide upon the terms of their contract and for the City Council to approve or reject it, and, if it contains the provisions stipulated in the Urban Redevelopment Law, as here it does, it is not for the courts to pass upon the merits of suggestions as to how the contract might be strengthened by amendments the desirability and effectiveness of which are for the consideration solely of the agencies and governing body to which the Urban Redevelopment Law has committed that responsibility. Plaintiff objects to the fact that by the terms of the proposed contract the title to property acquired by the Authority is to be conveyed to the Redeveloper instead of being retained until the redevelopment is actually completed. It would seem clear, however, that either the title must be transferred to the Redeveloper pending the process of redevelopment, with the Authority relying meanwhile upon the Redeveloper's covenants for the performance of its obligations under the contract, or the title must remain during that interim in the Authority, with the Redeveloper relying meanwhile upon the obligation of the Authority to convey the title after the redevelopment shall have been performed; whether the one or the other of these alterna-

tives should be adopted is a practical, administrative matter for the contracting parties, and for them alone, to determine.

Our conclusion is that there is no feature of this redevelopment project, of the proceedings taken to effectuate it, or of the contract by which it is to be accomplished, that is violative of the Constitution or the Urban Redevelopment Law, and that therefore plaintiff and intervening plaintiffs are not entitled to the injunction which they seek.

The bill is dismissed at plaintiff's costs.